We will hear argument this morning in case 1958-07 Edwards v. Vannoy. Mr. Belanger? Mr. Chief Justice, and may it please the Court, a verdict by 11 is no verdict at all. It's a line from the Court earlier this year that ended Louisiana's non-unanimous jury scheme. On paper, it restored the full breadth of the Sixth Amendment's jury trial right to Louisiana's. But we need to place the effect of this ruling into perspective. This laudable ruling would only apply to cases then pending or recently adjudicated. It meant nothing to Mr. Edwards, who was serving a life sentence at Angola for a verdict that would be illegal everywhere else, since Louisiana is the only place that would jail you for natural life on a non-unanimous verdict. Ultimately, the question before the Court is why should the Sixth Amendment mean something less to Mr. Edwards? Members of the Ramos Court were divided on how to reconcile the fractured decision in Apodaca with then-existing precedent. This division cleared two paths to holding that Ramos applies retroactively under Teague, two paths for providing a remedy to those jailed by a jury scheme we know was morally wrong at its inception and is unconstitutional. For some justices, Apodaca was dead on arrival since its deciding votes rationale was foreclosed by precedent. For these justices, Apodaca provided no precedential value, and Ramos is an old rule dictated by precedent that simply restored the Sixth Amendment's full measure either through the Due Process Clause or the Privileges or Immunities Clause of the 14th Amendment. For other justices, Apodaca was such a wrongly decided decision that it needed to be explicitly overruled. For these members of the Court, Ramos should be a watershed rule requiring retroactivity as this restores fairness and accuracy to jury trials in Louisiana. Both paths remedy something we all know to be wrong. Both paths will provide the promise of a fair trial to all Louisianans. Mr. Chief Justice, I'm ready to entertain questions from the Court. Thank you, Counsel. I think your biggest hurdle is the Court's decision in DiStefano where we held that the jury trial right itself should not be applied retroactively. What we're talking about here is a subordinate right to a unanimous verdict, a lesser included right. How do you get around DiStefano? There's two considerations I would like to bring to the Court's attention. DiStefano itself was just dealing with the judge's ability to make a decision, and as this Court noted in Duncan, you cannot say whether or not necessarily that a judge-rendered decision is more or less accurate than a jury-rendered decision. Our case here deals with the intricacies of what goes on in the jury room. I will also note that I think the more analogous case, Mr. Chief Justice, is the Brown decision. It too provided the same retroactivity standard that was incorporated in DiStefano, which relied heavily on state interest, and that decided to apply the Birch decision retroactively, which prevented Louisiana from having non-unanimous petty juries. In Ramos, five of us thought that Apodaca was a precedent that was being overruled, and therefore it was the most compelling evidence that it was a new rule. Were those five justices unreasonable? Well, when we get to the reasonableness standard of the jurist, it's an objective criterion. I think that we can all agree that the Sixth Amendment requires a unanimous jury, and that we can all agree that the Bill of Rights are fully incorporated to the states at this point. Normally, the reasonable jurist standard goes hand-in-hand with being dictated by precedent, but Apodaca was such a bizarre decision that it broke those two hands apart, and that's why it is in a unique universe of one, Mr. Chief Justice. I think, particularly given your answer on DiStefano, that you have something of a burden of establishing that the unanimous jury is necessary to avoid an impermissibly large risk of an inaccurate conviction. What is your best empirical evidence for that? Well, I have two. First is we have a MIKI that provides some statistics on the actual exoneration coming out of Louisiana. Of the 65 or so cases that they've identified, half of those cases were eligible for a non-unanimous verdict, and from that population of half, half of those, or one-quarter of the 65, were actual exonerations of non-unanimous jury verdicts. I would also turn the Court's attention to a law review article published in Notre Dame after Gideon v. Wainwright was decided, written by Abe Crash. It's the right to a lawyer, the implications of Gideon v. Wainwright. Crash was one of the brief authors in Gideon, and he reported data in that Florida at that time had about 8,000 people in jail, and 4,500 of those were jailed without a lawyer. So the system accounted for that. If Gideon is going to be our watershed rule, we can look to see just the numbers there, and they're radically different from what we have here. And so you have a system where we look to see whether or not the system itself was fair, and a non-unanimous jury is not fair because it flies in the historical tradition of this country. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, we agree this is a, unlike Montgomery, this is a procedural rule. So other than Gideon, can you think of another case where we have said that a procedural rule was retroactive? Well, not since Teague, but when we go back to the Brown decision, that was applied. That was applying Birch retroactively, and it dealt with the same issue of unanimity in the Louisiana jury trial. On your statistics that you, or the data that you just suggested about unanimous versus non-unanimous juries, how do you respond to the arguments on the other side that the statistics and the studies are a mixed bag and it really doesn't move the dial very much one way or the other? Well, we have to look at whether or not the process seems fair. Our tradition puts together the reasonable doubt and unanimous jury together. We want people to come together as a community to be convinced beyond a reasonable doubt that this person needs to be deprived of their liberty. And so there are studies that suggest that the effectiveness of deliberation is simply cut short when you don't have to have a unanimous jury, and that systemically leads to the possibility of an inaccurate conviction. When we go back to those Gideon numbers out of Florida I just mentioned, I mean certainly not all of the 4,500 people would have been convicted, but we're talking about more than half the population in the jail at that time. It leaves room for the premise that the system can be inaccurate and unfair, even though it may in many instances lead to conceivably the right decision. But I don't know how it translates right to counsel versus unanimous jury. What has the court said? What have we said in our cases about non-unanimous juries? Well, going back to the Brown decision, it was required. Birch and Brown both required unanimous juries. We've had Apodaca on the books for quite some time. I think the cases we have actually, if not endorsed, it certainly saw it sitting comfortably, if not awkwardly, with our case law. I would respectfully disagree with that. While this court has acknowledged Apodaca for quite some time, I do not believe that Apodaca was used for what it's being argued to stand for, and that's we're going to have a watered-down Bill of Rights. Let me change a bit and go a little bit different direction. Let's assume that the court finds that this is retroactive. How do you get around the relitigation bar in 2254 D1 of APO? I have two points to make on that. First, if the court were just simply to decide retroactivity and save for another day any procedural objections, this case will go back down to the Louisiana courts where we will have a viable claim to make on state post-conviction. Secondly, first of all, I don't necessarily agree that there was a decision on the merits, for starters, for purposes of D1. But even if the court were inclined to think there was, when we go to E2A subsection 1, new rules made retroactively by the United States Supreme Court would allow petitioners like Mr. Edwards to get in under a different portion of ADEPA. So I don't think when you read those two statutes together that it really necessarily poses a problem. Thank you. Justice Breyer? Thank you. How many approximately, what's your rough estimate of if you win, how many new trials in Louisiana will be called for? At this point, we believe the maximum population is 1,600 people. I do not believe that all of those 1,600 people will be able to establish that they had a non-unanimous jury. I think Amiki did a good job breaking down the statistics, and it's probably closer to 1,000. And from that, there's different subsets. Some of these people will either be eligible for parole soon or they will benefit from a change on the habitual offender law, or they are also in jail for a very significant unanimous jury conviction. And can the Louisiana system handle that? Oh, yes, sir. I mean, we're only talking about... How many trials are there in a year in Louisiana? I don't know. I do not know the exact number. That varies by jurisdiction. But I believe there's 145,000 cases filed per year, and we're really looking at our estimates of maybe two to three cases per prosecutor. So the system is more than capable of accommodating this type of caseload. Thank you. Justice Alito? This whole quest for watershed rules is rather strange. We keep saying there were some in the past that were discovered, but it's not clear that there are any new ones that haven't yet been discovered. But, you know, maybe, just maybe, there might be a watershed rule out there that hasn't been discovered. I mean, it sort of reminds me of something you see on some TV shows about the quest for an animal that was thought to have become extinct, like the Tasmanian tiger, which was thought to have died out in a zoo in 1936. But every once in a while, deep in the forests of Tasmania, somebody sees a footprint in the mud or a howl in the night or some fleeting thing running by, and they say, aha, there still is one that exists. So, I mean, all that is a wind-up to getting back to the question that Justice Thomas asked. Why should we decide whether this Teague exception applies to a habeas petition brought by a state prisoner without first deciding whether it's barred by AEDPA? Well, the retroactivity issue, as I said earlier, new rules made retroactive by the United States Supreme Court can be litigated by another portion of AEDPA. Secondly, I do believe that there is a legitimate disagreement as to whether or not this case was actually decided on the merits and state post-conviction. My recollection of what had happened on the record below is that we were summarily dismissed for no legal or factual basis. So I don't believe the merits were fully addressed. Another oddity about applying the watershed rule inquiry in this particular case is that the test for a watershed rule depends pretty heavily on Justice Harlan's decision, his opinion in the Mackey case, where he relied on exactly the rationale, the concept of ordered liberty, Palco versus Connecticut rationale, that the lead opinion in Ramos excoriated. So would it be consistent to apply it here? Well, I do think this is a watershed rule. There are so many parallels between this case and Gideon. Both recognized fundamental bedrock principles, and both had to deal with cases that were inconsistent with those principles and restore the fundamental rights at issue. For Gideon, it was the right to appoint a counsel, and here it's the unanimous jury requirement. Well, isn't part of the watershed rule inquiry whether it's consistent with ordered liberty? Well, it is, and I don't know how we can say that a non-unanimous jury isn't. Didn't Justice Gorsuch's opinion repudiate that, ridicule that approach? Well, I read Justice Gorsuch's opinion as not finding precedental force with Apodaca. Yeah, and Justice Powell's opinion in Apodaca was based on what? Well, Justice Powell thought that the Sixth Amendment wasn't fully incorporated to the states, and we know that to be wrong. And he thought it wasn't incorporated for what reason? He didn't believe that the Sixth Amendment was fully incorporated through the due process clause of the Fourteenth Amendment. All right, thank you. Justice Sotomayor? Counsel, can you explain that 1,600 number? Is that all prisoners that are in jail currently, whether it's a year old or not or past their epitime? Is that the total prison population? When you mean by prison population, if you mean that, are those the people that are in jail? Yes, Justice Sotomayor. All right, and so your statistic is based, you're saying, some of them may not be able to prove that they were convicted by a non-unanimous verdict. Is that correct? That's correct. Some of those 1,600 may not be able to do that, Your Honor. Why are you guessing 1,000? Based on AMICI's efforts to pull the court records on those 1,600 people, they haven't been able to establish that yet. But even for purposes of just assuming that all 1,600 could prove it, it is still a burden on the petitioner to show that they had a non-unanimous jury. And there are many instances where we may find that lawyers didn't simply ask for the polling. That would just be on a case-by-case basis. Thank you, counsel. Justice Fagan? Mr. Belanger, as you know, I thought that Apodaca was a precedent, so you would have a very steep climb to get me to think that Ramos was anything other than a new rule. So I want to focus on the watershed inquiry. And in that inquiry, we've talked a lot about accuracy. And I think somebody previously asked you about your empirical evidence, and I'll just give you sort of my sense that the empirics here are sparse, maybe surprisingly sparse, as to how this unanimity requirement works with respect to what I take to be the ordinary meaning of accuracy, which is simply a reduction in the error rate in trials. And so, too, it seems like one's tuition is not necessarily in your corner. That it might be that the unanimity rule allows more guilty people to go free than it stops innocent people from being convicted. Or at least it's just not certain. So I guess what I'd like to ask you is whether you're – well, I mean, number one, do you just contest all of everything that I just said? But number two, are you talking about accuracy in some different sense? Your first sentence to us was a verdict by a non-unanimous jury is no verdict at all. And then you talked about a verdict can be inaccurate and unfair, even though it leads to the right decision. And I guess what I'm asking is, are you talking about, and do you think in our cases we've been talking about, accuracy in some different sense than simply the reduction of errors in whatever direction? I do not think that accuracy needs to necessarily be statistics driven. I've just provided the statistics that were available for illustrative purposes. A verdict by 11 is no verdict at all is an accurate statement. The way the framers intended the Sixth Amendment jury trial right to be. I go back again to Gideon, which this court has recognized as the exemplar for the watershed rule. If the figures in that Notre Dame article were accurate, we're talking about three times as many more people as we have affected in Louisiana. And we're also talking about half of that prison population, where here we may be talking about 5%. I do believe it is a systemic approach to say whether or not a trial that's deprived someone of his liberty with not a unanimous verdict is fair. Could I ask you about your argument, which hasn't come up so far today, but featured prominently in your briefs about the racial aspect of this rule, picking up on Justice Gorsuch's opinion and Justice Kavanaugh's opinion about how the non-unanimity rule started as a racially discriminatory one. How does that play into the Teague analysis, and how can it play given that we've held Batson non-retroactive? Well, I think this is a case that is different than Batson. A Batson case is something where you're looking at the particular actions of an individual prosecutor in an individual case. And Batson requires speculation. We don't know if there would have been a unanimous verdict or not with a Batson-compliant jury. Here we know. We can show that this was not a unanimous verdict. We had at least one juror and sometimes two jurors vote not guilty. And the types of cases that we'll be talking about moving forward, the burden will be on the petitioner to show, I actually have a non-unanimous jury. And so it is measurable, whereas Batson was not. I do think that the racial origins of the non-unanimous jury is something to consider. It shows that this type of system was set up for the purpose of not being accurate, for the purpose of not being fair. And even though the state has tried to cleanse itself, it still has a negative, racially disproportionate impact today. Justice Gorsuch? Good morning, counsel. I'd like to start with your first argument, that Ramos did not announce a new rule. I'm certainly sympathetic to that point of view. I believe the court had for well over 100 years spoken about the unanimity requirement, as you know. But only a plurality agreed with me on that. And there were a couple of joiners who thought that Apodaca was a precedent of the court. The single justice speaking for himself, defying existing precedent, was nonetheless self a precedent that we had to abide. And, of course, the dissenters took that point of view. How can we get to where you want us to go in that light? Do we account for the dissenter's position? Should we discount the dissenter's position, even if we do discount that? What about the fact that the majority itself had different views? I would have two responses. First, I believe y'all's opinion and Ramos' did set up two paths for the court to decide retroactivity. Secondly, I don't, while I respect the dissenter's viewpoint and realize that may be how they feel today, I do not necessarily count the votes in dissent to say explicitly we've overruled Ramos. Apodaca, rather. I apologize. Just flesh that out for me a little bit more as to how you see this is not a rule, not a new rule. Certainly, Justice Ginsburg and Justice Breyer and I thought that's correct. But some of the other joiners, even in the majority, did not. What about them, if you have us discount the dissent? Yes. So, you know, the Sixth Amendment has always required unanimity. And then going back to the Malloy versus Hogan decision, we have said that we do not have a watered-down bill of rights. So the two lines of precedent there, Sixth Amendment requires unanimity, and that the Sixth Amendment is fully incorporated to the states leads to one logical conclusion, and that is that Louisiana had to apply a unanimous jury scheme. And, you know, Justice Powell's decision is just a unique opinion. It is one that requires us, if we are to follow it, to go to take what is considered a fundamental bill of rights and marry it up to something that was foreclosed at the time the opinion was given. And I just don't think that is something you will ever see ever again. I think we would sit down people to explain that these are the two lines of precedent. Louisiana has a 10-2 system. Do you think that would hold water? I think people would say no if they did not know about the Apodaca decision. I surely hope you're right. With respect to the watershed route, your alternative route, you've gotten different variations of the question, but I guess the way I'd put it is that Teague holds out this promise that there's going to be some watershed rule, and so Gideon is an example, which predates Teague, of course. But then ever since, we haven't found a single one. Is this a false promise? If it is, should we just admit it's a false promise? If it isn't a false promise, then what counts? What principle counts if DeStefano doesn't count, Ring doesn't count, Batson doesn't count, Crawford doesn't count? Who are we kidding, and what should we do about it? Your Honor, I couldn't find it better. For Teague to mean anything, there has to be something that counts, and that's why I think that Ramos is more analogous to Gideon than any of these other cases that we have decided in the past. Both decisions restored our understanding of fundamental bedrock principles. Both of these decisions took away a case that deviated from those prior precedents, and because you'll never see an opinion like Apodaca again, we can all rest assured that this is not going to open any type of floodgate. This has to be a watershed rule if you find that Apodaca was explicitly overruled by Ramos. Thank you, Counsel. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Counsel. I had been concerned that your approach would require us to chart a new path on retroactivity. As Justice Thomas and Justice Alito pointed out, we have a long line of cases, and you were just discussing with Justice Gorsuch post-Teague cases such as Wharton about the Crawford rule and many others where we have declined to apply a new rule retroactively on collateral. I'm also, though, concerned about some of the pre-Teague cases, which I think are on point here. The Chief Justice brought up DiStefano. You've equated Ramos to Gideon. The dissenters in DiStefano equated the jury trial right itself to Gideon, Justice Douglas and Justice Black in their dissent. I just want to give you an opportunity. The jury trial right not applying retroactively, but the unanimous jury right applying retroactively on collateral review seems like an asymmetry. Sure. Two responses to that. First of all, I think we have to remember that DiStefano was decided by a different standard of retroactivity than Teague. The three factors in existence at that time, two of them were heavily weighted towards the state's reliance interest. That was reliance on law enforcement and the overall effect on the administration of justice with a retroactive application. Those two enumerated factors are removed from Teague analysis. We just have to focus on fairness and accuracy. The second point is that that issue would have required the court to say that a judge-made decision is somehow so inconsistent in accuracy and fairness than with a jury decision. That has not been the position of this court. It is a bit different. Okay. On the Batson angle, as you know, in Ramos, I thought the Batson precedent was an important one in thinking about how the nonunanimous jury actually operated in practice. I think Batson is a landmark opinion and one of the more important opinions in this court's history in terms of ensuring that trials occur without racial discrimination. Yet, in Allen v. Hardy, we did not apply Batson retroactively. I know Justice Kagan referenced this with you. That's another asymmetry I'm concerned about here in this case. Your distinction of Allen v. Hardy would be? I'm sorry. My distinction, Your Honor, would be that Allen v. Hardy was also using the pre-Teague standards that heavily relied upon the reliance factors of the state. Secondly, again, with Batson challenges, they're hard to measure. You just do not know if a Batson-compliant jury would or would not have found guilt beyond a reasonable doubt. If that's here, I can measure it. I think that's a fair point. Last thing I wanted to mention, you several times cited Brown v. Louisiana, and I agree with you, the plurality there is supportive of you, but the opinion that was decisive was the concurring opinion of Justice Powell and Justice Stevens, and they would have applied Birch retroactively only on direct to cases pending on direct, not on collateral. Any response to that? Yes. You know, with the Teague analysis now, we do really make that distinction between direct and collateral review, but Brown was illustrative of the fact that the standard at that time applied the same standards on direct and on collateral review. I think the premise that unanimity was required and under a standard of review applicable at the time, it was. Thank you, counsel. Justice Barrett? Mr. Belanger, I want to press you a little bit more on Justice Kagan's questions to you about what accuracy means, because when I heard your answers to Justice Kagan, it was hard for me to distinguish between your view of the accuracy prong and your view of the bedrock procedural element prong, the fairness of the proceeding, because you kept saying, well, it's possible for a non-unanimous jury verdict to have reached the right result, i.e., maybe convicting someone who actually, in fact, had committed the crime while still being unfair. Can you help me understand a little bit more how your two prongs are distinct, what accuracy means? Well, the accuracy component is we're looking to see whether or not the system of how the trial took place was fair. And in Gideon v. Wainwright, we have said that all of these cases where people were not represented by counsel was not fair. But I can't tell you today how many of those people would have been exonerated. Well, right, you might not be able to identify a specific number, but, I mean, I think what Gideon was saying is that there is a significant chance that someone may have been convicted when he otherwise would not have been or when it reached the wrong results. I guess I don't understand. You know, you've got statistics saying that in Louisiana, as many unanimous verdict defendants have been exonerated or even more than those who have been convicted by non-unanimous juries, or that Oregon has a lower rate per capita of exonerations than those states that do have the unanimous right. So what does it mean? Are we trying to ask whether juries wrongfully convicted someone because the majority saw the case in the wrong way and the one dissenter in the jury or the two dissenters in the jury were right? I'm just having trouble understanding what we're measuring. Well, this type of verdict would not be a verdict anywhere else but Oregon. So fundamentally, at its premise, it is not a conviction. Trying to look at fairness and dealing with how this jury verdict can stand, and I have to go back to why it was created in the first place. This jury scheme was created so it would not be accurate, so it could disproportionately impact a segment of the population. And it is true that it still has those negative effects even today. Well, in cases like Crawford or even Batson, you pointed out that you called it speculative and Batson as to whether a juror that had been struck would have voted differently, but here we know that someone would have voted differently. I mean, Batson is an egregious example of racial contamination and discrimination in a jury that may well have affected the verdict. It seems to me that it would be speculation here, too, to think that the case would have come out differently with unanimous jury. Well, I don't think we have to speculate here. In our particular case, I have one juror on every count that voted not guilty, and I have another juror on some counts that voted not guilty. People that want to raise Ramos retroactively will have to come into court and show that they had a non-unanimous jury. And so there is no speculation as to whether or not we have a proper unanimous verdict in these types of cases. Okay. Thank you, Counsel. Counsel, a minute to wrap up? Ramos is retroactive in either of two ways. For members of this court who viewed Apodaca as an anomaly that did not alter prevailing constitutional standards, Ramos was logically dictated by precedent and set out an old rule. For members of this court who viewed Ramos as announcing a new rule, it is a watershed rule of criminal procedure akin to Gideon. Jury unanimity predates the founding and ranks amongst our most indispensable rights. It has significantly improved the accuracy and fairness because a verdict taken from 11 is no verdict at all. The state has no legitimate interest in avoiding retroactivity. Louisiana's non-unanimous jury scheme was thoroughly racist and discriminatory in its origin. As members of this court said in Ramos, we should not perpetuate something we all know to be wrong only because we fear the consequences of being right. Thank you, Mr. Chief Justice. Thank you, Counsel. General Merrill? Thank you, Mr. Chief Justice, and may it please the Court. Louisiana adopted its 10-2 jury verdict rule in 1974 after a new constitutional convention where delegates expressly relied on Apodaca v. Oregon and Johnson v. Louisiana when revising its criminal procedures. Petitioner minimizes Louisiana and Oregon's reliance interests and dismisses Puerto Rico's entirely, but there can be no doubt that declaring the Ramos rule retroactive unsettles thousands of cases that involved terrible crimes in all three jurisdictions. Requiring new trials and long final criminal cases would be impossible in some and particularly unfair to the victims of these crimes. Ramos is unquestionably a new rule. This Court has held on numerous occasions that a discarded precedent is the clearest sign of a new rule. Six justices in Ramos agreed that Apodaca was a binding precedent and virtually every jurist, state and federal, addressing the issue before Ramos viewed it that way as well for almost 50 years. Petitioner concedes that Ramos announced a procedural rule so Ramos only applies retroactively if it's a watershed rule. While undoubtedly important, Ramos isn't a watershed rule. A supermajority verdict does not render a trial fundamentally unfair nor does it seriously undermine factual accuracy of the verdict. In some cases, unanimity might improve accuracy, but in others it might diminish it. Here Edwards confessed to rape and armed robbery and was identified by one of his victims. Because Ramos was decided long after Edwards' conviction became final, a Teague retroactivity bar should prevent him and others like him from benefiting from Ramos' holding. This Court should affirm the Fifth Circuit's denial of a certificate of appealability. General, you talk about Ramos as overruling Apodaca, but it's questionable exactly what it overruled. I think it's more accurate to say it overruled the decision rather than the opinion because it's not really clear what the opinion was. Doesn't that discount the conclusion that it's a new decision? It's not the same as overruling a typical precedent? No, Mr. Chief Justice. For one thing, I think the question is how lower courts would have perceived it when they were applying the rule at the time, and this Court, even in Ramos, recognized that the Court itself has been studiously ambiguous and even inconsistent about what Apodaca might mean, but there's no question that its result was binding. I think its result was always binding on lower courts, and this Court has also very carefully guarded its right to overrule its own precedent, even where it was the result that was binding, if not the reasoning. Your friend tells us that making Ramos retroactive is not going to have a very significant impact on the criminal justice system in Louisiana. Do you agree with his math, I guess, that it's going to be simply two or three additional cases per prosecutor in the state? We absolutely disagree with that math, and I think that it is certainly not fair to suggest that we can just distribute all serious felony, nearly by their end number, 1,600 or more, new appeals and new trials for people that might be retroactively impacted by this. You can't just hand out cases to anybody who happens to be an assistant district attorney. Some of those people actually enforce laws in city court, or they collect money for—they do civil cases. Thank you, counsel. It's just not fair to spread them out that way. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, there's been some discussion about what we thought on this Court about Apodaca and the decision, et cetera, and there has been some confusion, but in the lower courts, do you know of any court that did not think that Apodaca permitted or perhaps allowed the use of non-unanimous juries, or actually did not think that Apodaca held that non-unanimous juries were permissible? No, Justice Thomas, not a single one. State and federal judges, 100 percent of them believed that it was settled precedent. And, in fact, the petitioner, even in his habeas petition, acknowledged that it was a settled petition, as he did at the time that he brought this issue up in front of the commissioner at the state trial level. So what role should that play in our analysis of whether or not this is a new rule? Well, I mean, I think it plays a significant role, because both under Teague and under AEDPA, the Court asks what was clearly established law at the time that the state adjudicated the claim. And I would also disagree with my friend's position that the state, that he claims that this wasn't adjudicated on the merits. It clearly was raised on and adjudicated on the merits by the commissioner and the state district court in post-conviction relief. One quick question. What's your view of what the term accuracy means? Does it mean scientifically accurate, both in acquittal and convictions, or is it loading over a thumb on the scale one way or the other to prevent inaccurate convictions? Well, I think this Court has treated the accuracy question as a question of factual accuracy. And under Teague, the analysis asks an even harder question, I think. It's not enough to say that it's aimed at improving the accuracy or that it's directed toward enhancing reliability or accuracy in some way. The question is whether the new rule remedied an impermissibly large risk of an inaccurate conviction, and I don't think you can say that about a supermajority verdict rule. Thank you. Justice Breyer? I have two questions. The first is, do you know any numbers about new trials that would be required in Puerto Rico or Oregon as well as yours? And the reason I think that's important is I've always seen Teague as a kind of compromise here, that because of the 14th Amendment applying to the states, our Court, this Supreme Court, was insisting upon somewhat fairer constitutional procedures, but they didn't want to let everyone out of prison, so they compromised. Now, if that's so, I'd like to know the total impact. Do you know anything about Puerto Rico and Oregon, or do you know where I could find it? Justice Breyer, I don't have exact numbers. Puerto Rico and Oregon both filed amicus briefs emphasizing their belief that this would have a very significant impact in their states, and Oregon cites the two cases that are currently challenging plea agreements, and we also have concerns about that. We know that the issue in our state has been raised to challenge a plea agreement as well. So it doesn't just affect those that were non-humanitarian verdicts. It also has been raised as a claim to undermine and attack plea agreements, and those are even larger in number. But just in our state, we would take the Promise of Justice Initiative's numbers at face value, and I think 1,600 is an awful lot of new trials. And also, my totally separate question is, what do you do about Brown v. Louisiana? It says that it's retroactive because a six-person jury has to be unanimous. It can't be five to one. So if a six-person jury can't be five to one, a 12-person can't be ten to two, and if the first was fundamental, why isn't the second? Well, I think Brown is distinguishable in a couple of ways, but I think to the kind of question of accuracy, I think that Brown specifically related to the number of jurors and it held that it was retroactive in part because I think it found that five was simply not enough, and it was looking at Ballew and Birch collectively and finding that even where you had a six-man jury, you ultimately only had a five-person verdict, and in Ballew, the court had said five wasn't enough for the jury to actually do its job. Thank you, counsel. Justice Alito? Gideon v. Wainwright, which recognized the Sixth Amendment right to appoint a counsel if the defendant is indigent, was a watershed rule, wasn't it? Well, this court has always pointed to Gideon as the one example that would be considered a watershed rule, so yes. But that was not based on the original meaning or understanding of the Sixth Amendment right to counsel. Isn't that right? That's right. I think the discussions in all of the court's cases about Gideon and why it was watershed points to the primacy and centrality of the rule throughout the process of a criminal prosecution from start to finish. Well, maybe that's your answer to the next question I was going to ask, but if the Gideon rule, which was not the original meaning of the Sixth Amendment, is a watershed rule, how could we find that the unanimity rule, which the court held in Ramos, was dictated by the original meaning of the Sixth Amendment, does not rise to the level of a watershed rule? Well, Justice Alito, I don't think that the historical roots of the rule is what determines whether or not it is a watershed rule. I mean, that's certainly not how the court examined it in Schreyer v. Summerlin. I think the court has actually just looked at two questions, and that is whether it alters the court's understanding of a bedrock procedural element that is essential to fairness of a proceeding. And it can't be met, the standard can't be met, simply by showing the rule is based on a bedrock right, and I would submit that Ramos is a rule that may be built on other bedrock rules, but it didn't establish a bedrock rule. Well, those who insisted on including the Bill of Rights as a condition for ratifying the Constitution certainly thought that the rules protected by the Bill of Rights were bedrock rules, or if they thought of this rather strange term, watershed rules. So isn't there something rather odd about our saying, well, that's what they thought, but we know better now, and some of the rules that they thought were bedrock rules really are not so bedrock or watershed. But there are some others, like the Gideon Rule, which we now think are more important. So those would be retroactive on collateral review. Well, I think, Justice Alito, that that's changing the nature of the Teague analysis. Teague doesn't focus, and none of this Court's precedents in conducting the Teague retroactivity analysis have focused necessarily on the historical roots of the rule in deciding whether it was or should be held retroactive under Teague. And EDPA asks an even more limited question. Thank you, Counsel. Justice Sotomayor? Counsel, could you tell me, and I'm going to ask the Solicitor General the same question. If this is not watershed, give me what you think might be. And it harkens back to the questions of some of my colleagues earlier of the other side, which is, since Teague we haven't found anything watershed, are we claiming an exception that we're never going to utilize? No, Justice Kagan, I don't think so. I mean, I think it's fair to move over the possibility. Counsel, this is Justice Sotomayor. Oh, I'm sorry. But why don't you start again? I'm sorry. Give me hypotheticals of what you think might qualify. Okay. I mean, I think, Justice Sotomayor, that I would look potentially back at the purpose of the scope of the writ. I mean, for one thing, I think you're applying, you are in the context of habeas corpus, so I think that's important. And I don't, you know, this Court has never applied anything as watershed other than Gideon, but I think when you talk about the original context of habeas corpus, the Court has pointed to things like a trial that was tainted by mob violence or, you know, something of that nature. I mean, that is one potential answer, I think, to that question. How about a trial that was held by a special master without consent? Well, I think a trial held by a special master without consent potentially goes to jurisdiction. I mean, the Court has also addressed the scope of the writ and the historical scope of the writ in the context of whether a court had actual jurisdiction to entertain the case. And if it wasn't a court of competent jurisdiction where a special master without consent would arguably not be a court of competent jurisdiction. All right. I am a little troubled by the empirical studies, but for a different reason than you are. You haven't put anything to the contrary. You really haven't put any evidence that there aren't a significant number of people who have been wrongfully convicted because of the lack of unanimity. You say that some people benefited and some people didn't, but why does it matter? Meaning, if some people didn't benefit from the rule and may have been not guilty, doesn't that answer the watershed question on its own? No, I don't think that it does because I think the focus of the question, the question focuses on whether it is a procedural element that is essential to the proceeding and so seriously undermines the process that we can't have any competence in the verdict at all. I think that's what the question is, and that simply cannot be said. Thank you, Counsel. Justice Kagan? General, in In re Winship, this Court held that a reasonable doubt standard had to be used by any criminal jury. That was before Teague, but if Teague had applied, do you think that that would have been held to be a retroactive rule? I mean, I think it's possible. I mean, you know, the Court has not declared Cage to be retroactive. Just what I asked. I mean, it's possible, yes or no? It's hard to say. I mean, I think that the beyond a reasonable doubt standard goes to the proof that's put on throughout the course of the trial. I'm going to tell you, General, that I think you're having trouble with the question. It's hard to say because two things are true. We cannot imagine that rule being viewed as anything less than fundamental to our entire system. That's number one. But number two, if you're only talking about accuracy as like a reduction of error rate across the board, I mean, we wouldn't have that rule. We would have a preponderance standard. So, I mean, that's what makes it hard, and I guess I think it's inconceivable that it wouldn't be held to be retroactive. Well, Justice Kagan, I think the Court did examine the context of the beyond a reasonable doubt standard in the context of a non-unanimity rule in Johnson, and it really did look at the question of each individual juror carrying, and I don't think we can assume that 10 or 11 jurors are not doing their duty and following their jury instructions. And that was, I think, part of the premise of Johnson. When you look at a non-unanimity rule, you're looking at each individual jurors, whether each individual juror would carry their burden and take their instruction seriously, and the Court found there's no reason to assume they won't. Thank you. Justice Gorsuch? Good morning, Counsel. As I heard you in response to the Chief Justice, you said you absolutely did dispute the estimates of about 1,600 cases, but I haven't actually seen or heard anything where you do dispute that that is the appropriate number. Justice Gorsuch, we don't dispute the 1,600 number. I mean, we have no basis to dispute it, but what we disputed was the premise that you could simply grant new trials and distribute all of those cases across the board to any prosecutor who happens to be an assistant district attorney. I understand that, but the number, the universe is agreed, it seems, then. We have no reason to dispute that number. The amici who filed that has been in the system trying to generate data about how many convictions there might be, but it is all based on records. Anyway, as I understand your argument, okay, it's 1,600, but it's really difficult. Wouldn't we expect it to be difficult if, in fact, there were a watershed rule? If this really were a significant change and an important one, wouldn't we expect there to be some burden for the state? And where does Teague tell us that that matters? Well, I think every retroactivity question assumes or takes into account that there will be some burden. And I think that it's built into the Teague analysis in terms of our reliance interest. And that was the pre-Teague link letter balancing test expressly took that into account. But you agree with me, though. I think you'd agree that if it is watershed, it's retroactive, regardless of the burdens on the state. And, in fact, we'd expect some burdens on the state in such a case, right? If it's watershed, that is the question in the Teague analysis is whether it's retroactive. I'm not sure it answers the question of whether it's still precluded under AEDPA. I understand that, counsel. I'm not asking about AEDPA. You told me not to even think about AEDPA in your brief. Fine. So I'm talking about under Teague. Once we answer the Teague question that it's watershed, it doesn't matter how many cases there are. In fact, if it really were watershed, we'd expect there to be a considerable number, right? Yes. I mean, I think Teague is calibrated to account for reliance interest. That's the presumption against retroactivity. Justice Kavanaugh? Thank you, Chief Justice, and good morning, General Merrill. In Ramos, Justice Gorsuch's opinion, and mine as well, talked about the history of non-unanimous juries, the linkage to racist origins. I know your point about the 1974 adoption, but I also looked at how it was linked to the history of race-based peremptory strikes in Batson and how those two things had come from a similar place, a similar unfortunate place in our history, in the country's history. In this case, there's a black defendant. The state uses its peremptory strikes to strike all but one black juror, uses four of its six peremptories against black veneer persons, strikes five blacks for cause because several of them, in part for several of them, had a family history of incarceration. And you're left with one black juror with a black defendant. And then you get an 11-to-1 verdict on the armed robbery count, the two kidnapping counts, one of the armed robbery counts, two kidnapping counts, and the rape count. And the one juror is the black woman, the black juror. This case seems like a classic example of what we were concerned about with the combination of peremptory challenges being used on the basis of race, maybe not to strike every juror, but to strike all but one, and then the non-unanimous jury system complementing the peremptory challenges. I know there wasn't a successful Batson challenge in this case, but the facts of this case certainly seem troubling on how it all played out. I'll just give you an opportunity to react to that if you want. Justice Kavanaugh, I mean, the Batson claim was rejected because there was absolutely no basis for Batson challenges in this case. And, I mean, you can read the voir dire in the record and see that there were non-race-based, there were neutral reasons for striking the jurors that were struck. And in some of these cases, Sidney Eatman is one example, there was a white male juror and a black male juror struck at the exact same time for the exact same reason. Thank you, counsel. Justice Barrett? General Murl, I'd like to ask you about 2254D. So, Justices Thomas and Gorsuch asked Mr. Belanger whether 2254D erected an independent bar, you know, regardless of what we say about Teague. We have an amicus brief saying that 2255D1 supersedes Teague, so there are no exceptions, there is no watershed exception, and that's because 2254D1 precludes a federal court from granting relief if the state court adjudication resulted in a decision that was contrary to or involved in unreasonable application of, sorry, permits granting relief only in that circumstance. And 2254D1 makes no mention of watershed rules, perhaps reflecting Justice Alito's view that, you know, these are Tasmanian tigers and there are none left. And so, under 2254D1, federal courts ought not be engaging in the Teague exception analysis. Do you have a position on that? Yes, Justice Barrett. Our position is that Edwards can't surmount Ed's post-relitigation bar and that it asks a very narrow question, and it's a backward-looking question about what was clearly established law at the time the state adjudicated the claim, and that was Apodaca. So, I think, you know, we do have a, that is our position on it. We answered the question the court posed with regard to Teague, and the court has treated Teague as a separate threshold inquiry. But do you think we're wrong to do that? So, you think we're wrong to do that, however? You think that 2254D1 does supersede Teague so that there should not be an independent Teague inquiry? That, I don't think that's been entirely briefed. We simply argued in our brief that he is precluded under both. So, you don't have a position on the amicus brief? I think we would join the United States in saying that that might need to be litigated further if you got to that point. But, I mean, our position is that he is precluded under both, that even if it was a watershed, we would still preclude it under that statute. So, I mean, I guess we do believe that it was overridden. A minute to wrap up, General? Thank you, Mr. Chief Justice. While the Ramos decision is no doubt an important one, Ramos' rule incorporating the unanimity rule against the states isn't a watershed rule. Permitting a supermajority rule is not a fundamentally unfair procedure, nor does the absence of unanimity seriously undermine the accuracy of the verdict. This court should affirm the Fifth Circuit denial of COA. Thank you, Counsel. Mr. Michel? Thank you, Mr. Chief Justice, and may it please the court. The rule announced by this court in Ramos applies prospectively and to convictions on direct appeal, but it does not apply to final convictions on federal collateral review. That result follows from a straightforward application of Teague. The Ramos rule is new because whatever disputes might exist about the precedential weight of Apodaca in this court, it was at least reasonable for lower courts to rely on it when petitioner's conviction became final in 2011. And the rule is not watershed because it is not essential to accuracy or fair trial. After all, as the Chief Justice suggested at the outset of the argument, the right to a jury trial itself is not watershed, so subsidiary rights like that of a unanimous jury cannot be either. That result also reflects the purposes of federal collateral review. As Teague emphasized, habeas is not a substitute for direct appeal. When a criminal judgment obtained under the law at the time becomes final, it should stay final outside the very narrow exceptions that are not satisfied here. Counsel, I'm not sure that your reliance on DeStefano is really right. Isn't the right to a unanimous jury more important as a matter of factual accuracy than the right to a jury itself? I mean, you would expect a judge to be at least as accurate and presumably even more than a jury. So I'm not sure that the fact that DeStefano is not retroactive really makes the case that this right shouldn't be. Mr. Chief Justice, a couple of responses. I think the court in Summerlin, for example, said that it's just hard to tell whether a judge or a jury is going to be more accurate. And I think that alone is enough to show that petitioner can't meet the high standard here. But I take your point even if you don't think DeStefano gets you all the way. The court has repeatedly declined to find Watershed other subsidiary jury rights, including in Teague itself, which both reaffirmed the court's decision in Allen v. Hardy that Batson is not retroactive on collateral review and also rejected the fair cross-section requirement. So I think all of those subsidiary jury rights, including the unanimity right at issue here, simply don't meet the Watershed test. Counsel, very briefly, does the federal government have any light to shed on the statistics that we've been talking about? Mr. Chief Justice, the one we know the best is the federal interest here. As we mentioned in our brief, there is a sort of ripple effect from the vacatur of these convictions on federal recidivist sentences. We think the number is somewhere around a couple hundred. It's hard to pin down the exact number, but there would be an impact on the federal system. Justice Thomas? Yes, thank you, Mr. Chief Justice. Counsel, would you just briefly discuss the term accuracy and what you think it means in this context? Yes, Justice Thomas. I think the court has not always spoken with one voice on that, but there are certainly a number of opinions in which accuracy, I think, is understood just to mean actual accuracy. The court in Wharton, for example, when discussing Crawford, made the point that confrontation could sometimes actually make a trial less accurate. And the court in Butler v. McKellar, when discussing the Fourth Amendment right at issue there, made the same point. So I think the court has focused on factual accuracy, but even if you were to adopt a more generous understanding of it and look to sort of the risk of wrongful convictions, I still think the right here doesn't come close, especially under this court's decision in Johnson v. Louisiana, which expressly held that a non-unanimous jury verdict does not impugn the fairness or accuracy of the conviction. And what role do you think that the sorted roots of the non-unanimous jury rule in Louisiana should play in our analysis? Well, I think the court, at least some members of the court, took that into account in the decision last time, the decision at Ramos. But I think as both Justice Gorsuch and Justice Kavanaugh's opinions recognize, there's simply a separate question here. I think Justice Gorsuch said you shouldn't double count the reliance interest between stare decisis and retroactivity. And Justice Kavanaugh, of course, while recognizing those racial issues, seemed to suggest that this right shouldn't apply retroactively. So I think it can't be dispositive here. So just briefly, where do you think the authority of this court to apply rules retroactively comes from? So I think this court has said in Danforth, for example, that Teague ultimately reflects an interpretation of the habeas statute. I think the court has, over centuries, exercised the right to control the finality of its judgments through rules of res judicata and preclusion. And I think there's a similar source of authority here. Justice Breyer? Well, maybe it'll just be repetitive, but we're talking about the Anglo-American system. And that's in the Seventh Amendment, jury trial, and so forth. Now, within the confines of that system, why isn't unanimity basic? And if it's basic, aren't these just words, the accuracy and so forth? And you're really trying to think of how basic is this and then compare it to everybody who's going to be released from jail. That was the old system. Maybe Teague changed that a lot. I don't know. So what do you think? Why isn't it basic? Well, Justice Breyer, I suppose I could start with the Anglo part of the Anglo-American system. I do think it's notable that England, for example, continues to use non-unanimous jury verdicts. And as the court pointed out in Johnson v. Louisiana, respected institutions in the Anglo-American system, like the ABA and the ALI, respected professors have all endorsed non-unanimous jury verdicts on legitimate grounds, such as avoiding hung juries. So I do think, although the court, of course, concluded in Ramos that the text and history of the Sixth Amendment require unanimity, I don't think that's the same thing as saying that it's essential to accuracy and fairness under the inquiry the court has outlined at Teague. Okay. I see. Thank you. Justice Alito? Well, where does the authority to impose the Teague rule on the states come from? If it's an interpretation of the habeas statute, then don't we have to deal with 2254D? If it's not an interpretation of the statute, it would have to come from a provision of the Constitution, such as the suspension clause. Is that where you think it comes from? Justice Alito, I want to distinguish between the general retroactivity bar of Teague, which is what I meant to refer to earlier by saying that's an interpretation of the habeas statute informed by equity and the historical scope of the writ. Separately, I think your question is getting to what's the authority for the exceptions to Teague. The majority of the court in Montgomery v. Louisiana suggested that the substantive rule exception is rooted in the Constitution. The court has not reached a similar determination with respect to the watershed rule exception, I think in part because it's never been applied, but it forced to confront that. I think we would say that's not constitutionally required, and it's supported by, at best, an equitable determination similar to that that informs the retroactivity bar. Why should we decide this case under the Teague exception if there is a possibility that the Teague exception doesn't matter as a result of EDPA? What kind of a decision would that be? To be candid, Justice Alito, we were trying to follow the court's lead with the question presented here, which refers to retroactivity. Of course, the opinions of Ramos referred repeatedly to Teague. I do think that, with respect, this is a straightforward case under Teague. I think that's plenty to resolve it. It's a separate and independent basis from EDPA. It would be enough to resolve the case. Thank you. Justice Sotomayor? Counsel, do you think the Teague exception is an offset? If not, can you think of any example of a potential watershed rule that is not Gideon? And second, you dispute – I'd like to answer both, so I'm going to give you your remaining time for that. You dispute that unanimity is necessary to increase accuracy in jury verdicts. But I can't think of any justification other than that for the unanimity requirement that the Constitution seeks that says that founders must have thought that that process enabled accuracy. So I don't know why I should second-guess them or on what basis we would second-guess them. If it's okay, Justice Sotomayor, I might start with the second question first. I think the plurality opinion in Ramos importantly didn't rely on functional considerations like fairness and accuracy in reaching its interpretation of the Sixth Amendment. It said the unanimity requirement may serve purposes that evade our current notice. I think the most extensive discussion of that issue is found in footnote 2 of Justice White's opinion in Apodaca. Of course, that opinion is no longer governing, but the history is still valid, and it suggests a number of different historical bases for the unanimity requirement, including the medieval notion that one juror who disagreed would be committing perjury, which would have the consequence of damnation, and the medieval notion of consent, which, among other things, was manifested in the requirement that Parliament itself pass laws by unanimity. I do think there are some medieval origins of this that don't necessarily go to accuracy or fairness as we would think of it today. On your first question, I do want to make the point, of course, that the substantive rule exception to Teague is alive and well, and the Court has found substantive rules recently. As to the watershed rule exception, it's true that the Court has said Gideon is the only one in recent memory, but I think that reflects more that the things we would think of as watershed simply have been recognized earlier. Justice Kagan? Mr. Michel, you told Justice Breyer that the unanimity requirement wasn't basic, but when I read the opinions on the majority side in Ramos, I think they say it absolutely is, that it's basic in the exact same way that a beyond-a-reasonable-doubt standard is basic, that it goes to the inherent characteristics of what, in our system, a jury has to do to find a defendant guilty. I mean, Ramos says that if you haven't been convicted by a unanimous jury, you really haven't been convicted at all, and so how could it be that a rule like that does not have retroactive effect? Well, Justice Kagan, I take all your points about the merits decision in Ramos, but I think, as Wharton, for example, explains, the fact that a constitutional rule is compelled by the texted history of the Constitution itself doesn't mean that it's retroactive on collateral review. I'm not just talking about the origins of the rule and whether it goes back to founding times. There's more in Ramos. There's an idea that in those founding times, this rule was thought of as inherent in what it meant to have a fair trial by jury and an accurate trial by jury, so that whatever came out of that process, if unanimity wasn't a part of it, there wasn't a true conviction. That's what Ramos says. I'm just trying to take what Ramos says seriously here, which I think you ought to do, too. Absolutely, although I do think, with respect, you could say the same thing about Duncan and Apprendi and other cases in which the court has found that a determination by a jury beyond a reasonable doubt is required on the merits and yet is not retroactive on collateral review because there's simply a different inquiry there. Again, I guess I would return to the court's holding in Johnson v. Louisiana that a non-unanimous jury verdict does not impugn the fairness or accuracy of the majority verdict if guilty. Thank you, Mr. Michaud. Justice Gorsuch? Good morning, counsel. Just to pick up there and with Justice Sotomayor's line of questioning, I understand your argument to us today that a watershed rule exception in TEA might have served a purpose at some point, but it doesn't any longer because we captured all watershed rules of criminal procedure. None are likely to come forward, and it is hard to see if this doesn't qualify, which the founders thought was an essential component of the jury trial right, then it's pretty hard to see what might emerge that would qualify. Is that a fair statement of the government's position? I think yes. I accept I would qualify to say we're not saying that it's impossible that such a right could emerge, but I agree with the court's repeated statement that it's very unlikely that one will emerge at this point. Does the government have anyone in mind that might emerge? I mean, any possible hypothetical that you can imagine? There's nothing that we're thinking of. I guess I would also note that, of course, when Teague made that statement, which has been repeated for many decades, the court was well aware of the non-unanimous jury issue, and so if the court thought that that was something that could arise in the future, it seems unlikely it would have said that no watershed rules are likely to arise in the future. You're giving a lot of credit to the Teague court for thinking about all these eventualities, and I appreciate that. Does all this point out or maybe suggest that post-conviction review here has been overextended and that while Teague was once an attempt to rein in considerable efforts, I think of Brown v. Allen, to apply the Constitution post-conviction, that maybe this whole area is that Teague itself is a little outmoded and that maybe we ought to just give up the ghost? Is that the government's essential point of view? I'm not sure I would go all the way there, but I do think there's a lot of merit to what you're saying. I do think actually if you look back at Justice Harlan's opinions that gave rise to Teague and Judge Friendly's article that was relied on, it was saying something pretty similar to that, that the exceptions really have to be narrow. The substantive exception when something is not a crime and the watershed rule exception has to be similarly high, something so serious that you're really not sure a crime was committed. And so I think if you keep the exceptions that narrow, Teague is serving a good purpose. But I agree that they could be overread and they would do real damage. Justice Kavanaugh? Thank you, and good morning, Mr. Mischel. I wanted to follow up on something Justice Gorsuch was asking the Solicitor General of Louisiana about, which is do you think the number of cases that would be affected has any bearing on whether something is watershed? I think it does. I think it goes to the reasons for having a high bar for both the new rule and the watershed rule inquiries. I think as I was just discussing with Justice Gorsuch, the court in Teague very consciously broke from its past retroactivity jurisprudence, which it found had been too lax, and emphasized finality and federalism in adopting the new Teague rule. And I think the reason it did that is it was worried about large-scale disruptions of the state criminal justice system like that would be worked here. Thank you. Justice Barrett? Good morning, Mr. Mischel. I want to talk to you about accuracy, and the first thing I'd like to ask is a follow-up to your dialogue with Justice Thomas. And this is, I think, a point of clarification for me. You were distinguishing between factual accuracy and what I understood you to say would have been the more generous standard of considering the likelihood of wrongful conviction. What is the difference between the two of those, and how is the latter more generous than the former, if I understood you correctly? Well, I think it's a tricky question. I had understood some of the questions earlier in the argument to reflect a view that, you know, there should be a sort of thumb on the scale in favor of the defendant. And so, you know, if there's twice as likely a risk of wrongfully convicting, that should have outsized risk as compared to not convicting. And, you know, I do think it's a sort of difficult, abstract question. But as I said to Justice Thomas, I don't think that however you resolve that abstract question, it's going to matter here. Well, what then is factual accuracy? Because as you were pointing out, our decisions haven't spoken necessarily with one voice about what the accuracy prong means. So what is factual accuracy as distinguished from the risk of wrongful conviction? Sure. Butler versus McKellar, I think, is a good example. And that was a case about excluding a confession or defendant's statement after he had requested a lawyer. And the court said, you know, it actually might contribute to factual accuracy to have the statement in, because we would know more about what actually happened. Of course, if you were worried about wrongful convictions, then I think you might have a different view of that. But no matter how you cash out that somewhat theoretical distinction, I don't think this rises to the level of a serious accuracy problem. Thank you. A minute to wrap up, counsel. Thank you, Mr. Chief Justice. I guess I'd just close by saying, you know, this court's decision in Ramos will have great significance going forward. But the question before the court today is a different one. As the Ramos plurality noted, it's fatigue doctrine that frees the court to reconsider its constitutional decisions without having the risk of seriously disrupting long final judgments. And we think that's the right result here. The petitioner was convicted of serious crimes after a full and fair trial. His conviction became final almost a decade ago. To retry him now would require, at a minimum, making his victims relive their trauma. And in many other cases, a retrial might not be possible, causing disruptive effects in both the federal and the state systems. We think this is a heartland case for the application of fatigue bar. Petitioner's final convictions should remain final. Thank you. Mr. Belanger, rebuttal? Unanimity and reasonable doubt are two doctrines that work hand in hand to assure that we have a fair and accurate judicial system. Gideon, Winship, and Ramos all point us to the realization that it is the legitimate risk of inaccuracy within the system that matters. As this court said in Baloo, the risk of sending 10 innocent people to jail is greater than the risk of sending one guilty person free. Apodaca was an opinion that was dead on arrival because it predicated its decisive vote on analysis that was foreclosed by precedent at the time it was decided. Ramos removed this uncomfortable thorn from the side of our legal system, and as such, it became a unique case which falls on a line that checks the boxes as being both an old rule and a new rule. First, Ramos is an old rule. It ignores – it has followed preexisting precedent that was logically dictated by the case law that preceded it. Ultimately, the state fails to dispute that jury unanimity and incorporation of the jury trial right are deeply rooted in American jurisprudence. Let's be clear. Ramos did not break any new ground under Teague. Second, for members of this court who viewed Apodaca as precedent, Ramos announced a watershed rule of criminal procedure. The state does not meaningfully address the parallels between Ramos and Gideon. Both decisions restored bedrock Sixth Amendment principles, and both decisions compelled outlier states to apply rights they previously refused to recognize. A conviction can only be legally accurate if the states prove this case beyond a reasonable doubt of all jurors. The expressly racist origin of non-unanimous juries also contravene any state interest in finality and repose. Since Ramos, members of this court have recognized that the original motivation for the laws mattered, notwithstanding any subsequent re-ratification. The same is true here. In the end, the state has no legitimate interest in avoiding retroactivity, but for its desire to let Mr. Edwards languish in Angola for the rest of his life. On what grounds can we let this happen when we know his conviction is unconstitutional? The answer to that question is none. Thank you, Mr. Chief Justice. Thank you, Counsel. The case is submitted.